PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

Matthew Biben (mbiben@debevoise.com)
Winston Paes (wmpaes@debevoise.com)
Olivia Cheng (ocheng@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

FILED
CLERK

2018 JUL -5 PM 3:57

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

G.S. and C.S., individually and on behalf of their child, G.S.,

*Plaintiffs*,

-against-

New York City Department of Education,

*Defendant*.

---

Complaint

Civil Case No. CV 18-3876

DONNELLY, J.

SCANLON, M.J.

Plaintiffs, G.S. and C.S., individually and on behalf of G.S., by and through their attorneys, Debevoise & Plimpton LLP, for their Complaint, allege and state the following:

### PRELIMINARY STATEMENT

1. This action is brought pursuant to the Individuals with Disabilities Education Act (hereinafter "IDEA"), 20 U.S.C. §§ 1400-1482 and Article 89 of the New York State Education Law, N.Y. Educ. Law §§ 4401-4410-c to appeal a final decision of the State Education Department State Review Officer ("SRO") dated March 9, 2018.

2. Plaintiff G.S. is a seven year-old-boy with traumatic brain injury that has caused him to have global delays, including substantial impairments in cognition, memory, attention, reasoning, abstract thinking, judgment, problem solving and information processing. He has

significantly delayed gross and fine motor skills, is unable to communicate verbally, and has severely impaired vision. G.S. is also non-ambulatory and is unable to stand without assistance. He depends on assistance for all activities of daily life, including feeding, toileting, dressing, and grooming. Despite these challenges, G.S. has shown an ability to learn and improve when placed in a suitable classroom setting.

3. In August 2016, rather than providing suitable accommodations to address G.S.'s unique and intensive needs, the Department of Education ("DOE") decided to offer G.S. an inadequate Individualized Education Program ("IEP") for the 2016-2017 school year at a District 75 public school. This decision was the result of a procedurally deficient Committee on Special Education ("CSE") review.

4. Faced with the prospect of G.S. being placed in an inadequate classroom setting, on August 17, 2016, G.S.'s parents timely notified the DOE of their intention to unilaterally place G.S. at the International Academy of Hope ("iHope"), a specialized school for students who suffer from traumatic brain injury ("TBI"), for the 2016-2017 school year. While at iHope, G.S. has shown significant progress in his intellectual, emotional and physical abilities. G.S. has also achieved many of the goals listed on the IEP as a result of the small classroom, individualized instruction, and 60-minute therapy services he has received at iHope.

5. On January 23, 2017, pursuant to 20 U.S.C. § 1415(f)(1), G.S.'s parents requested a due process hearing. After four days of testimony, on November 6, 2017, the Impartial Hearing Officer ("IHO") determined that the DOE offered G.S. a free and appropriate public education ("FAPE") and that G.S. was not entitled to tuition payment. The record is clear that the IHO's incorrect decision was influenced by improper factors, in particular, a marked disdain for Plaintiffs' representative.

6. Plaintiffs timely appealed the IHO's decision to the New York State Department of Education's Office of State Review pursuant to 20 U.S.C. § 1415(g). On March 9, 2018, the SRO improperly and erroneously dismissed that appeal.

7. For the 2017-2018 school year, the DOE again denied his request for placement at iHope and offered G.S. the same inadequate IEP as 2016-2017. G.S.'s parents again filed a request for a due process hearing with an IHO. Notably, the IHO evaluated the DOE's proposed IEP and, having been presented with the same indisputable facts of G.S.'s condition and progress at iHope, found that the DOE failed to provide G.S. with a FAPE for the 2017-2018 school year. The IHO also found that iHope was an appropriate placement and that the equitable considerations required an award of tuition funding for iHope.

8. G.S.'s parents bring this action to reverse decision No. 17-108 of the New York State Review Office, which denied G.S.'s claim for tuition payment, to find that Defendant failed to provide G.S. with a FAPE and, as such, require the Defendant to reimburse the costs of G.S.'s placement for the 2016-2017 school year.

## THE PARTIES

9. Plaintiffs, C.S. and G.S, parents of G.S., residents of the State of New York, have resided at all relevant times at an address within the New York City Department of Education's purview and within the Eastern District of New York.

10. Defendant, the DOE, is a local educational agency as defined by the IDEA, 20 U.S.C. § 1401(19) and New York State Education Law § 4401, and, as such, is required to provide a FAPE, including special education programs and related services, to its students with

disabilities in compliance with the applicable federal and state statutes, regulations, and the U.S. Constitution.

## JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. § 1331, which provides the district court with original jurisdiction over all civil actions arising under the laws of the United States, and based on the enforcement provision of the IDEA, 20 U.S.C. § 1415(i)(2); and under 28 U.S.C. § 1367, which provides for supplemental jurisdiction.

12. Venue is proper under 28 U.S.C. § 1391(b)(1), in that Plaintiff and Defendant are residents of and/or are located within the Eastern District of New York.

## FACTUAL ALLEGATIONS

*Description of G.S.*

13. G.S. is a seven-year-old student who has been classified by the DOE as having multiple disabilities and as a child in need of special education services.

14. G.S. was born prematurely at 23 weeks, 5 days gestation. As a result, G.S. spent the first three months of his life in a neonatal intensive care unit ("NICU"), suffering primarily from respiratory and heart problems.

15. At approximately ten months, G.S. began having seizures. Until recently, G.S. had three to four seizures per day.

16. He has received diagnoses of Gross Motor Function Classification System (GMFCS) Level-5 cerebral palsy, seizure disorder, failure to thrive, severe developmental delay, hypotonia, high myopia, nystagmus and mild thoracic kyphosis.

17. G.S. has severe developmental delays, both mental and physical. According to his evaluations, G.S. functions at the developmental level of a child less than one year old with vision impairment.

18. G.S. requires constant monitoring for seizure activity, adapted equipment for alternate positioning, multisensory supports, visually modified materials, and individualized and direct instruction in an educational setting.

19. G.S. is non-verbal and non-ambulatory, and requires assistance in all daily life activities, including feeding, toileting, dressing and grooming. G.S. is unable to bear any weight on his feet without assistance, has limited postural control, and cannot operate his wheelchair independently.

20. G.S. is easily distracted and has trouble concentrating. He requires a very quiet environment with limited visual and auditory distraction. G.S. can become extremely withdrawn in loud or chaotic situations, and he is unable to learn in these settings.

21. G.S. also has extensive management needs which require significant human and environmental modification.

22. G.S. tends to have tantrums at activity transitions, as was reported in his preschool report.

23. G.S. engages in self-stimulatory behaviors that require frequent intervention and redirection, as these behaviors can impair the student's ability to learn new motor planning if left unaddressed. Additionally, some of these behaviors, including head banging and biting, are self-injurious.

24. The reports from the Helen Keller preschool note that G.S. can be difficult to redirect from these behaviors and that he is often distracted from other activities because of these behaviors. G.S. is most responsive when he is redirected through a more stimulating activity.

25. Because of his brain injury, G.S. requires high frequency and high duration of therapeutic services in order to give him sufficient time to develop the neural pathways necessary to learn a skill. These pathways are developed by frequent repetition. Before these neural pathways are developed, students with TBI lack mental control over their muscles, resulting in dramatic physical limitations.

26. G.S. received DOE Early Intervention and pre-school services at the Helen Keller School for the Blind. There, he was in a classroom with a ratio of 8:1:2 (eight students, one teacher and two classroom paraprofessionals), and received speech language therapy, physical therapy, occupational therapy and vision education.

*May 2016 IEP*

27. On May 26 2016, G.S's parents, knowing that their son was aging out of the Helen Keller school, participated in an IEP meeting with the DOE. At the time of the IEP, G.S. was approximately five years old and entering kindergarten.

28. Attendees of the IEP meeting included a district representative, two social workers, a physical therapist, a school psychologist, a general education teacher, an assistant principal, a home care case manager, G.S.'s parents and counsel for the parents. Additionally, the IEP Coordinator of iHope, a special education teacher from G.S.'s preschool, and another physical therapist participated in the meeting by phone.

29. After discussion with G.S.'s parents, current service providers and evaluators, the CSE correctly determined that G.S. was eligible for special education as a student with a TBI.

30. The CSE also recommended that G.S. receive two 60-minute sessions per week of individual occupational therapy, three 60-minute sessions per week of individual physical therapy, two 60-minute sessions per week of speech language therapy, and three 60-minute sessions per week of individual vision education services.

31. The CSE recommended that G.S. be placed in a classroom with a 12:1:4 ratio, which consists of twelve students, one teacher, four classroom paraprofessionals, and any one-to-one paraprofessionals required by individual students; a setting that was wholly inappropriate for G.S. given his management needs, his need for direct instruction, and his inability to learn in chaotic environments.

32. The CSE also failed to make a recommendation as to G.S.'s transportation needs.

33. G.S.'s parents requested that the CSE reconvene to address G.S.'s transportation needs and the inappropriate 12:1:4 classroom recommendation in the May 2016 IEP.

*August 2016 IEP*

34. On August 1, 2016, the CSE reconvened with a different district representative, social worker, special education teacher, and general education teacher in attendance.

35. G.S.'s preschool teacher did not participate in this meeting and none of G.S.'s current service providers provided input.

36. The CSE predominantly adhered to the recommendations of the May 2016 IEP, except that they reclassified G.S. from TBI to a student with multiple disabilities and reduced his 60-minute therapy sessions to 30 minutes.

37. The CSE received no additional information regarding G.S. between the two IEP meetings that justified these changes.

38. The CSE refused to make any revisions to their 12:1:4 program recommendation despite strong evidence that it was inappropriate and failed to meet G.S.'s needs, including the facts that: (i) G.S.'s pre-school reports recommended a close student-teacher ratio; (ii) the 12:1:4 classroom groups students with a wider range of disabilities that do not have similar needs to G.S.; (iii) G.S. was making progress in a class size in preschool of 8:1:2; and (iv) G.S. has highly intensive management needs requiring a high degree of individualized attention that he could not possibly get when a teacher's attention is divided among 12 students with widely different needs.

39. The CSE violated state regulation 8 NYCRR § 200.6(h)(4)(ii)(a)-(b) which states that the maximum class size for special classes containing students whose management needs are determined to be highly intensive and requiring a high degree of individualized attention and intervention shall not exceed six students, and that the maximum class size for students with intensive management needs is eight students.

40. The CSE does not have classes for TBI students with a smaller teacher/student ratio. Rather than find an appropriate classroom setting, the CSE was attempting to slot G.S. into a pre-existing class.

41. The CSE has noted, at various times, that their available 6:1:1 classes are reserved either for students with Autism or students with severe behavioral problems.

42. But there is no indication within the regulations that a 6:1:1 is appropriate only for students with Autism or behavioral problems.

43. The CSE failed to consider nonpublic school alternatives, which provided lower student-teacher ratios with students similar to G.S. Instead, the CSE limited itself to see what was available in a District 75 school for a student and refused to depart from it.

44. G.S.'s needs are so intensive that, even after a year in which G.S. made significant improvement, the IHO for the 2017-2018 school year recognized that his needs could not be met in a 12:1:4 classroom.

45. The CSE's changing of G.S.'s sessions from 60 minutes to 30 minutes was made without the input of any of G.S.'s service providers and without any new information or evidence provided on which to base their decision.

46. In order for G.S. to gain therapeutic benefit from these services, he requires 60-minute sessions.

47. The allotted time for therapy begins when the therapist arrives at the student's classroom. The student is then often taken to a separate room for therapy.

48. At the recommended school, P.S. 811Q, the therapy gym is on the other side of the building from the recommended classroom.

49. Because he is non-ambulatory and requires two-person transfers, G.S. requires five to ten minutes of transition time when he moves from the classroom to therapy. In a 30-minute session, at least 10 minutes of his therapy would likely be lost due to these transitions.

50. G.S. also often loses focus while receiving therapy sessions, and 20 minutes does not allow for an adequate amount of time to get him back on task and to progress in obtaining full therapeutic benefit from the session.

51. Additionally, due to his brain injury, G.S. requires frequent breaks from therapy. When these breaks are accounted for, a 30-minute session does not provide enough time for G.S. to benefit from the therapy being provided.

52. Repetition is extremely important for students with TBI, as it is required to help them build the neural pathways necessary to learn a skill.

53. In a 20-minute session with frequent breaks and occasional distractions, G.S. would not have adequate time to repeat the desired skill, thus significantly impeding his ability to learn.

54. The CSE's recommendations improperly relied on generalizations rather than information specific to G.S. The CSE incorrectly assumed that a child of G.S.'s age could not handle 60-minute therapy sessions due to attention span, despite the fact that G.S.'s parents confirmed that G.S. was capable of focusing for 60 minutes when given one-on-one attention.

55. Many of the goals listed on the IEPs were inappropriate and not tailored to meet G.S.'s needs in a way that will enable him to be involved in and make progress in the general education curriculum.

56. Some of the IEP goals could not possibly be performed in the more limited time periods. For example, one goal called for G.S. to tolerate oral motor stimulation for 30 minutes. G.S. cannot possibly practice or perform this goal given that he will only have 30 minutes of therapy, at least ten minutes of which will be devoted to transportation and transitioning to and from therapy.

57. The August 2016 CSE also inappropriately revised G.S.'s classification from TBI, which had been agreed to by the May 2016 CSE, to multiple disabilities.

58. Multiple disabilities is an improper classification for G.S. because it fails to convey that G.S.'s disabilities stem from his TBI.

59. G.S.'s treating neurologist provided the CSE with a letter explaining that G.S. suffered from seizure disorder and cerebral hemorrhage, which are acquired brain injuries meeting the IDEA's definition of traumatic brain injury and that his brain injuries caused severe impairments to G.S.'s cognition, language, memory, attention, reasoning, abstract thinking,

judgment, problem-solving, sensory, perceptual, and motor abilities, psycho-social behavior, physical functions, information processing and speech. The CSE failed to consider this letter when developing G.S.'s IEP.

60. The CSE also failed to consider the statements of G.S.'s mother, who informed them that after the onset of G.S.'s seizure disorder she observed a deep regression in G.S.

61. The IEP's classification of G.S. failed to consider the differences in neural development between children with multiple disabilities and those with TBI, and therefore, failed to consider G.S.'s individual educational needs as a student with TBI.

62. The CSE's refusal to recognize that G.S. suffers from TBI is not only inappropriate, but detrimental to G.S.'s education because it ensures that his teachers and service providers lack accurate information about G.S.'s needs.

63. G.S. suffers from all of the impairments specifically enumerated within the definition of TBI. 8 NYCRR § 200.1(zz)(12).

64. The district representative gave no specific reason for changing G.S.'s classification, other than the fact that he exhibited multiple disabilities, including severe global developmental delay.

65. The district representative failed to consider the fact that the definition of TBI also includes the resulting impairments that adversely affect educational performance, and that such impairments are specifically enumerated in the definition of TBI.

66. The district representative incorrectly stated that "anything could be considered a brain injury," showing a lack of understanding of the classification and rendering it essentially meaningless.

67.  The district representative later testified that she had little experience with students with severe disabilities.

68.  On August 17, 2016, counsel for the parents gave the required 10 days' notice of the parents' intent to unilaterally place G.S. at iHope and requested payment of tuition in light of the DOE's failure to provide an appropriate placement.

*November 6, 2017 IHO Decision*

69.  On January 23, 2017, G.S.'s parents filed a Due Process Complaint and Request for Impartial Hearing regarding the DOE's denial of a FAPE to G.S. and seeking tuition payment for G.S.'s attendance at iHope during the 2016-2017 school year.

70.  An Impartial Hearing was held on March 20, 2017, May 8, 2017, May 23, 2017 and July 7, 2017.

71.  On November 6, 2017, IHO Robert Briglio issued his Finding of Fact and Decision. The IHO found that G.S. was not denied a FAPE and denied the request for tuition payment.

72.  The IHO correctly found that two of the goals set out in G.S.'s IEP exceeded his capability, and yet, found that on the whole, the goals were appropriate. In so finding, the IHO stated that he relied on testimony by the Assistant Principal at the proposed placement stating that such goals could be implemented at her school. The Assistant Principal had never met or evaluated G.S.

73.  IHO Briglio failed to adequately consider the recommendations of the iHope staff and G.S.'s neurologist, all of whom had personal knowledge of G.S. and his capabilities.

74.  IHO Briglio incorrectly found that the multiple disabilities classification was appropriate for G.S., even if he might also be classified as having a TBI.

75. This finding fails to consider the fact that a TBI classification includes other impairments stemming from a student's brain injury and therefore is the classification most suited to describe G.S. The TBI classification is rendered meaningless if students who suffer impairments from their TBI are not classified as such.

76. In contrast, for the 2017-2018 school year, IHO Suzanne Carter correctly determined that that G.S. should be classified as a student with a TBI.

77. IHO Briglio incorrectly found that the reports from G.S.'s preschool strongly supported a 12:1:4 classroom ratio. In fact, the report from Helen Keller recommends that G.S. receive the support of a one-to-one paraprofessional in a classroom with a close student to teacher ratio. There is nothing in the report to suggest that Helen Keller recommended a 12:1:4 ratio rather than a 6:1:1 or 8:1:1 ratio.

78. IHO Briglio incorrectly found that G.S. did not have substantial management needs requiring a 6:1:1 ratio, and therefore that the District 75 school was a FAPE. In making this finding, IHO Briglio relied on reports describing G.S. as "adorable," "endearing," "sociable," "happy," "engaging," and "good-natured." While behavior is one aspect of management needs, IHO Briglio failed entirely to consider G.S.'s other highly intensive management needs in finding that a 6:1:1 ratio was unnecessary.

79. IHO Briglio incorrectly found that iHope was not an appropriate placement because it did not provide necessary related services. In fact, iHope does provide related services. The fact that such services are charged separately from tuition does not render iHope an inappropriate placement.

80. In contrast, on May 27, 2018, IHO Suzanne Carter found that the DOE denied G.S. a FAPE for the 2017-2018 school year and found that iHope was reasonably calculated to enable G.S. to receive meaningful educational benefits.

81. iHope specializes in teaching students with brain injuries such as G.S. and the curriculum is specifically designed to serve G.S.'s unique intellectual and physical needs.

82. G.S. has been a student at iHope for the past two years and has made significant progress during that time.

83. IHO Carter cited the "extended school day, extended related service sessions to accommodate [G.S.'s] need for a two-person transfer, . . . rest breaks built into his related service sessions," and the "direct one-on-one instruction model that includes pacing, frequent opportunity to respond, feedback, and reinforcement" as examples of the services iHope offers that render it an appropriate placement.

*SRO Decision*

84. The parents appealed IHO Briglio's decision to the SRO in a timely fashion.

85. In a decision dated March 9, 2018, SRO Justyn P. Bates found that G.S. was not denied a FAPE.

86. Based on the facts above, SRO Bates erred in finding that G.S. was not denied a FAPE.

87. SRO Bates correctly noted that IHO Briglio erred in suggesting that there is a rule that all students in a 6:1:1 classroom must have behavioral management needs in order to meet the definition of highly intensive.

88. SRO Bates erred in finding that the CSE considered a variety of programming options for G.S. The CSE refused to consider any revisions to the IEP that would result in a

change of the actual program recommendation, as is evidenced by its refusal to adjust the length of G.S.'s therapy sessions after it was informed that such sessions could not be provided by its recommended placement.

89. SRO Bates erred in finding that the program recommendation addressed G.S.'s needs and was not based on his disability category classification.

90. The CSE plainly stated that a 6:1:1 ratio was not appropriate for G.S. because he did not have Autism.

91. IHO Briglio found persuasive the testimony of the Assistant Principal of the recommended placement that 30-minute therapy sessions were most appropriate because of her broad experience addressing the needs of students with multiple disabilities, despite never having met G.S.

## CAUSES OF ACTION

92. The actions by Defendant and the decision of the SRO, as set forth above, interfered with and denied Plaintiff G.S. his right to a FAPE under the IDEA, 20 U.S.C. § 1400 *et seq.*, and Article 89 of the New York Education Law, and the regulations promulgated under state and federal law.

### *Count One: Denial of FAPE in violation of the IDEA*

93. The Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

94. Defendant's failure to offer G.S. an appropriate IEP and school/class placement deprived him of his right to a FAPE.

95. The IHO and SRO erred in finding that the Defendants offered G.S. a FAPE.

96. iHope provided G.S. with an appropriate educational program for the 2016-2017 school year.

97. Equitable considerations favor tuition reimbursement.

### *Count Two: Denial of FAPE in violation of the New York Education Law*

98. The Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

99. By failing to provide G.S. with a free and appropriate public education, Defendant has violated the rights of G.S. and his parents under Article 89 of the New York Education Law and 8 NYCRR § 200 *et seq*.

### *Count Three: Denial of FAPE in violation of Section 504 of the Rehabilitation Act of 1973*

100. The Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

101. By failing to provide G.S. with a FAPE, Defendant has violated the rights of G.S. under Section 504.

### RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

102. Reverse SRO Decision No. 17-108 in its entirety, declaring it invalid and of no legal effect.

103. Reverse the IHO's "Finding of Fact and Decision" dated November 6, 2017 in its entirety, declaring it invalid and of no legal effect.

104. Declare that the Defendant's actions and failures to act have resulted in a denial of a FAPE for the 2016-2017 academic school year.

105. Declare that G.S.'s placement at iHope for the 2016-2017 school year was appropriate.

106. Declare that the Plaintiffs' claim for tuition reimbursement is supported by equitable considerations.

107. Order that the Defendant reimburse Plaintiffs for any amounts already paid to iHope, and directly pay to iHope any amounts still owed in connection with G.S.'s enrollment and attendance for the 2016-2017 school year.

108. Award to Plaintiff's counsel reasonable attorneys' fees and costs.

109. Grant any such other and further relief as the Court deems just and proper.

Dated: New York, New York
       July 5, 2018

DEBEVOISE & PLIMPTON LLP

By: *Winston Paes*

Matthew Biben (mbiben@debevoise.com)
Winston Paes (wmpaes@debevoise.com)
Olivia Cheng (ocheng@debevoise.com)
919 Third Avenue
New York, New York 10022
(212) 909-6000
*Attorneys for Plaintiffs*